1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**FILED**

JUL 1 6 2012

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

NOT FOR CITATION

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRUCE L. SHAW,<br><br>　　　　　　　Petitioner,<br><br>　vs.<br><br>ANTHONY HEDGPETH,<br><br>　　　　　　　Respondent. | No. C 10-5800 LHK (PR)<br><br>ORDER DENYING PETITION FOR<br>WRIT OF HABEAS CORPUS;<br>DENYING CERTIFICATE OF<br>APPEALABILITY |

Petitioner, a state prisoner proceeding *pro se*, filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. The Court ordered Respondent to show cause why the petition should not be granted. On June 2, 2011, Respondent filed a response. Although given an opportunity, Petitioner did not file a traverse. Having reviewed the briefs and the underlying record, the Court concludes that Petitioner is not entitled to relief based on the claims presented, and DENIES the petition.

**PROCEDURAL HISTORY**

On December 9, 2008, a jury found Petitioner guilty of first degree murder, and found that he personally and intentionally discharged a firearm. (Resp. Ex. A, Vol. 1 at 181.) Petitioner was sentenced to a term of fifty years to life. (Resp. Ex. A., Vol. 2 at 256-57.) On March 15, 2010, the California Court of Appeal affirmed the judgment. (Resp. Ex. E.) On June

23, 2010, the California Supreme Court denied review. (Resp. Ex. G.)

On December 21, 2010, Petitioner filed the underlying federal petition for writ of habeas corpus. In his petition, Petitioner alleged that: (1) his right to due process was violated when the trial court improperly limited voir dire, and (2) the trial court improperly restricted the jury from considering Petitioner's life experiences and background as it related to the issue of provocation.

## BACKGROUND[1]

Defendant acknowledged that he shot and killed the victim, Sirron Croskey, early on the morning on April 5, 2006. The crucial issue at trial was the extent, if any, to which the killing was mitigated by defendant's mental state and the events that preceded the shooting. [FN2.]

FN2. Therefore, our recitation of the facts need not dwell on evidence that proves the identity of the shooter, and will instead focus on the evidence pertinent to defendant's intent and mental state.

About 7:00 on the evening of April 4, 2006, Croskey left his girlfriend Yvette Whiten in their burgundy van, ostensibly to record some music. He was wearing tan Timberland pants, boots, and a fatigue jacket. Croskey called Whiten at 4:21 the next morning to tell her he was "with some friends" and "was trying to get home and that he loved" her. He "seemed happy" to Whiten, but also sounded as though he had been drinking. Whiten never heard from Croskey again.

Somehow, Croskey joined a friend Larry Stewart and defendant that evening, and together they appeared unexpectedly around 2:00 the next morning at a residence on Pippen Street in Oakland occupied by Taresa Griffin and Aggie Modica, among others. [FN3.] Croskey, Stewart and defendant sat on the couch in the living room of the house, drank alcohol and smoked "Black and Mild" tobacco. They also had some marijuana with them and "smelled like they had been smoking weed." They appeared to be "high," but Griffin and Modica did not notice any overt indications of animosity between them. After about 15 minutes, they left in a burgundy van. Defendant did not appear to be drunk and was "able to walk straight" when he left the house.

FN3. At the time Griffin was Stewart's girlfriend, of sorts; Modica is Griffin's cousin. The others who lived at the house were Griffin's aunt and her three children.

Croskey's body was discovered around 5:45 the evening of April 6, 2006, slumped in the front seat of a white car parked behind an apartment complex at 115 Catron Drive in Oakland. Blood was visible on the seat of the car and the victim's shoulder. A nine-millimeter shell casing was found on the front passenger seat. Croskey suffered an "entrance-type gunshot wound" in front of the right ear, and an "exit-type" wound to the left side of his face.

---

[1] The facts of this case are taken from the California Court of Appeal opinion in *People v. Shaw*, No. A124252 (Cal. App. 1 Dist. March 15, 2010). (Resp. Ex. E ("Op.").)

"Stippling," or powder burning, was detected on the victim's skin, which indicated that the shot was fired from close range. Elevated levels of alcohol, methamphetamine and ecstasy were found in his blood.

The investigation of Croskey's murder led Sergeant Tony Jones of the Oakland Police Department first to Griffin and Modica, and from there ultimately to Stewart. Jones then interviewed Stewart at the Oakland Police Department on the morning of October 11, 2006. Stewart initially denied that he was present when the shooting of Croskey occurred, but eventually admitted he "was there when it happened," and told Jones that "Bruce was the person that shot and killed" Croskey. Further investigation by Jones identified defendant as the man Stewart referred to as "Bruce."

Defendant was transported to the Oakland Police Department and interviewed by Sergeant Jones on the afternoon and evening of October 12, 2006. Stewart was placed in a separate interview room next door. Defendant was briefly taken to see Stewart and informed that Stewart had told the officers "what happened." Defendant then offered his version of the shooting of Croskey during several interviews.

According to defendant, on the night of the shooting he was walking on 90th and Bancroft when he encountered Stewart riding in the front passenger seat of a red van driven by Croskey. Defendant had been friends with Stewart for years, but had never met Croskey. Defendant accepted their offer to ride with them. They "rode around for a while," and eventually drove to a house on Pippin Street, where Stewart's girlfriend lived. Defendant and Croskey were left in the van while Stewart alone went inside the residence on Pippen Street. Croskey jumped into the back seat of the van, and after some brief conversation touched defendant on "his rear-end" and leg in a "way that a woman would touch a guy." Defendant "was offended by it," and told him to stop. When defendant then began to leave the vehicle, Croskey "grabbed his rear-end and tried to pull him back into the van." Defendant again yelled at Croskey to stop and angrily got out of the van. Croskey "snickered" and tried "to make a joke out of it," then left the van and went to the front door of the house.

Inside the house, defendant told Stewart "what had occurred inside the van." Stewart replied that "the victim had touched him, too." Defendant also said that Stewart gave him a Glock nine-millimeter gun as they left the residence or after they returned to the van. Defendant told Stewart that Croskey "had to go," meaning defendant was "going to kill him." Stewart agreed that Croskey "gotta go."

From Pippin Street they drove around "looking for some rims," and ended up on Catron Drive, where Croskey saw a white car "that had some rims on it" behind a building. After Croskey got into the passenger seat of the white car, defendant "shot him" through the open door. Defendant said Stewart gave him "the nod," after which he "just pointed" the gun at Croskey "and he fired." After the shot was fired, defendant and Stewart immediately ran from the car to Croskey's van and drove away. They "ultimately ended up in Sacramento," where they were chased by police officers and ran from the van.

Defendant then explained a childhood incident to Sergeant Jones during which, at age three, he was forced to engage in oral copulation by a

friend of the family.  Defendant did not remember any details of the molestation, but Croskey's act of touching him "took him back to his childhood."  He explained to Sergeant Jones that he shot Croskey "off anger" because "you don't let another man put his hands on you without doing nothing."  Defendant said: "I was just gettin' frustration out with somebody puttin' their hands on me."  He did not know he was going to shoot Croskey until the victim "got in the car."  He claimed that he aimed at Croskey's chest, and "didn't care" where he hit the victim as long as "it was gonna go somewhere into his body."  Defendant stated he did not even know Croskey had died until he was questioned.

Stewart was also interviewed again with defendant by Sergeant Jones, and essentially reaffirmed defendant's version of the events.  Stewart added that they were all "high" as they drove around Oakland after they left the Pippin Street residence.  Croskey was in a very emotional state after taking ecstasy pills.

The defense presented expert testimony from Dr. Jules Burstein, a clinical and forensic psychologist who qualified as an expert in the field of "homosexual panic," a subset of panic disorder which consists of an acute anxiety or anger response to a homosexual advance or "touching incident."  Homosexual panic may have two causes: a disturbing feeling that the one who is touching the person views him "as a homosexual," and prior sexual abuse as a child, which triggers "traumatic reminders" of helplessness and humiliation when a man is "touched in a sexual way by a man."  To conduct a psychological evaluation of defendant, Dr. Burstein interviewed him extensively in November of 2008, and conducted psychological tests.  Defendant described for Dr. Burstein the incident that culminated in the shooting of Croskey.  Dr. Burstein also examined defendant's medical records, which indicated that he had "been forced to orally copulate the penis of an older teenager when he was three years old."  Defendant disclosed "further examples of homosexual panic" to Dr. Burstein: first, that a staff person at the Seneca Center "grabbed him in the genital area" while attempting to restrain him; and subsequently, that he thought a staff person in another facility "fondled his genitals while he was asleep."  Dr. Burstein did not know if these acts as perceived by defendant actually "happened or not," but in any event they were "tremendously overloading and produced extraordinary anxiety" to him.  Dr. Burstein also learned that defendant was physically abused and neglected as a child.

Following his examination of defendant Dr. Burstein concluded that he suffers from a learning disorder, attention deficit hyperactivity disorder, posttraumatic stress disorder, depressive disorder, and has borderline intellectual functioning.  He also has poor social judgment and lacks capacity to properly understand or evaluate others.  In his relationships with others defendant is distrustful, resentful, oversensitive, paranoid, and narcissistic.  When presented with a "hypothetical" corresponding to the events that resulted in the shooting of Croskey, Dr. Burstein offered the opinion that defendant's conduct was "consistent with homosexual panic."  Defendant's perception of events and ability to respond rationally were further impaired by his ingestion of alcohol and drugs on the night of the shooting.  Defendant's actions were "compatible" with someone who felt he could not "take the level of anxiety and rage and shame" that was produced by "this persistent pattern of sexual touching."  Dr. Burstein agreed that an "average person" who is "not homophobic" would not have reacted in the same way.

1   (Op. at 1-5.)

2                                 **DISCUSSION**

3   A.   Standard of Review

4          This Court may entertain a petition for writ of habeas corpus "in behalf of a person in

5   custody pursuant to the judgment of a State court only on the ground that he is in custody in

6   violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).  The

7   petition may not be granted with respect to any claim that was adjudicated on the merits in state

8   court unless the state court's adjudication of the claim: "(1) resulted in a decision that was

9   contrary to, or involved an unreasonable application of, clearly established Federal law, as

10  determined by the Supreme Court of the United States; or (2) resulted in a decision that was

11  based on an unreasonable determination of the facts in light of the evidence presented in the

12  State court proceeding." 28 U.S.C. § 2254(d).

13         "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state

14  court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of

15  law or if the state court decides a case differently than [the] Court has on a set of materially

16  indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000).  "Under the

17  'reasonable application clause,' a federal habeas court may grant the writ if the state court

18  identifies the correct governing legal principle from [the] Court's decisions but unreasonably

19  applies that principle to the facts of the prisoner's case." *Id.* at 413.

20         "[A] federal habeas court may not issue the writ simply because the court concludes in its

21  independent judgment that the relevant state-court decision applied clearly established federal

22  law erroneously or incorrectly.  Rather, the application must also be unreasonable." *Id.* at 411.

23  A federal habeas court making the "unreasonable application" inquiry should ask whether the

24  state court's application of clearly established federal law was "objectively unreasonable." *Id.* at

25  409.

26  B.     Analysis

27         1.      Restriction on voir dire

28         Petitioner claims that, prior to the commencement of jury selection, defense counsel

1    submitted several proposed voir dire questions to the trial court which defense counsel wished to

2    include in the jury questionnaire. (Petition at 9.)  In general, the proposed questions (Resp. Ex.

3    A, Vol. 1 at 137-38) were intended to explore the prospective jurors' attitudes regarding an

4    expert opinion given by a forensic psychologist, and their feelings about the psychologist's

5    expected testimony concerning a psychological condition called "homosexual panic." (*Id.*)

6         The trial court rejected defense counsel's request to include questions that referred to

7    "homosexual panic," and precluded defense counsel from mentioning "homosexual panic"

8    during voir dire. (Resp. Ex. B, Vol. 1 at 37.)  The trial court ruled that defense counsel could

9    describe what a forensic psychologist does, the purpose of presenting the psychologist's

10   testimony, inform the jury that a forensic psychologist will testify, and then ask the potential

11   jurors if they would have trouble listening to or believing the testimony. (*Id.* at 40.)  The trial

12   court further ruled that if a juror answered in the affirmative, the jurors would be asked to

13   explain their answer. (*Id.* at 41.)  Although the parties were given permission to ask additional

14   questions of the jury panel during the selection process, defense counsel did not inquire further

15   about any juror's tendency to believe or disbelieve a forensic psychologist's testimony and

16   focused instead of general ideas of impartiality, the issue of murder, the presumption of

17   innocence, and the burden of proof. (Resp. Ex. E at 6.)

18        Petitioner argued that limiting the voir dire questions by prohibiting discussion of

19   "homosexual panic" during jury selection in order to discover potential juror bias and grounds to

20   challenge those potential jurors for cause, was a violation of his Sixth Amendment right to jury

21   trial and Fourteenth Amendment right to due process.  On direct appeal, the California Court of

22   Appeal rejected Petitioner's argument on state law grounds, recognizing that a trial court has

23   "considerable discretion" and a duty to "restrict voir dire within reasonable bounds." (Resp. Ex.

24   E at 8.)  The state appellate court further concluded that the trial court did not abuse its discretion

25   by prohibiting defense counsel from making additional inquiries that "were impermissibly

26   directed . . . at the anticipated testimony of the defense expert based on the specific facts of the

27   case: an explanation of the homosexual panic condition suffered by defendant, and a description

28   of the reasons defendant "was experiencing that at the time of the shooting."" (*Id.*)

1    Adequate voir dire is one component of the Sixth Amendment right to an impartial jury.

2    *Morgan v. Illinois*, 504 U.S. 719, 729-30 (1992); *Rosales-Lopez v. United States*, 451 U.S. 182,

3    188 (1981) (plurality opinion).   Only two specific inquiries are constitutionally compelled

4    during voir dire:  (1) inquires into a juror's racial prejudice against a defendant charged in a

5    violent crime against a person of a different racial group, *Mu'Min v. Virginia*, 500 U.S. 415,

6    425-26 (1991); and, in a capital case, (2) inquiries into a juror's views on capital punishment, *see*

7    *Morgan*, 504 U.S. at 730.  Neither one is applicable here.  To sustain a federal constitutional

8    violation, it is not enough that requested voir dire questions might have been helpful; instead, a

9    federal court is limited to determining whether the trial court's failure to ask certain questions on

10   voir dire rendered the trial fundamentally unfair. *Mu'Min*, 500 U.S.at 425-26 (1991).

11   Here, the trial court did not absolutely prohibit inquiry into the jurors' attitudes

12   concerning a forensic psychologist's testimony.  It only limited the questions regarding the

13   expert testimony by permitting the defense to ask general questions regarding the jurors' views

14   instead of specific questions that referenced specific portions of the defense case.  While

15   petitioner has conclusorily asserted that the restriction on voir dire was a denial of his

16   constitutional rights, he has not shown that any of the proposed, but rejected, questions would

17   have revealed any actual or perceived bias that would have resulted in the dismissal of any

18   prospective jurors.  In short, he has not demonstrated how the limitation of voir dire rendered his

19   trial fundamentally unfair.

20   Moreover, Petitioner has the burden to show that the state court's decision affirming the

21   restriction of voir dire questioning was contrary to, or an unreasonable application of, clearly

22   established Supreme Court precedent.  He has not made this showing. *See, e.g, Hamling v.*

23   *United States*, 418 U.S. 87, 140 (1974) (limiting voir dire to exclude specific questions regarding

24   the possible effects of education, political, and religious biases toward idea of obscenity did not

25   reach level of constitutional violation, and suggesting that trial judge's general inquiry into the

26   jurors' general views concerning obscenity was more than sufficient); *Ham v. South Carolina*,

27   409 U.S. 524, 528 (1973) (rejecting claim that trial judge's refusal to ask jurors about their

28   potential bias against bearded men was unconstitutional because possible prejudice against

1   beards was too similar to a multitude of other indistinguishable and possible prejudices).  In

2   addition, when a state court must apply a general standard, such as the "fundamental unfairness"

3   standard at issue here, state courts receive even more "leeway" than is standard under the already

4   deferential AEDPA framework.  *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009).

5   Accordingly, Petitioner has not shown that the state courts' denial of this claim was contrary to,

6   or an unreasonable application of, clearly established Supreme Court law.

7         2.   <u>Supplemental Jury Instruction</u>

8        Petitioner claims that the trial court erred in its response to a jury question, asked during

9   deliberations.  Specifically, the jury inquired whether it could consider Petitioner's life

10  experiences and background when making a determination of the issue of provocation.  The

11  California Court of Appeal summarized the trial proceedings and the parties' arguments as

12  follows:

13               The primary theory relied on by the defense was that the killing of
14        Croskey was mitigated from murder to voluntary manslaughter by the
             victim's apparent homosexual advances and defendant's resulting
15        "homosexual panic."  In support of the theory that defendant committed the
             shooting under provocation and thus without malice, the defense presented
16        evidence of a prior act of molestation he suffered and expert opinion
             testimony from Dr. Burstein on the effect of the experience upon him.
17        Defense counsel argued that the molestation endured by defendant as a child
             should be considered by the jury as a life experience that negated malice and
18        reduced the crime to voluntary manslaughter.  The prosecution countered that
             defendant's "background" and "the fact that he was molested" were not
19        relevant considerations in determining whether he responded as a "reasonable
             person" to the victim's acts of provocation.

20               The trial court gave standard instructions to the jury on voluntary
             manslaughter and provocation due to sudden quarrel or heat of passion that
21        may reduce the culpability for a killing from murder to voluntary
             manslaughter (CALCRIM Nos. 522 and 570).  During deliberations, the jury
22        sent a two-pronged question to the court seeking "guidance" on the issue of
             provocation: "1. In deciding weight and significance, can the jury consider
23        earlier experiences of the defendant (not just acts committed within minutes or
             hours of the crime) in the decision. [¶] 2. Is there any
24        interpretation/requirement analogous to manslaughter's 'ordinary person of
             average disposition' or can provocation be considered when the defendant's
25        actions do not fall within the scope of what an 'ordinary person . . .' would
             do?"  After discussion with counsel, the court declined to advise the jury that
26        defendant's "earlier experiences" could be considered in determining if
             defendant had been provoked.  Instead, the court repeated the standard "522
27        and 570" provocation instructions to the jury, and to those added: "Now, if
             your verdict is murder, you may consider the defendant's earlier experiences
28        in affixing degree of murder at first or second degree.  However, you may not

1    consider the defendant's earlier experiences in deciding whether he acted as
     an ordinary person of average disposition, which would reduce a murder to
2    manslaughter."

3    (Resp. Ex. E at 9-10.)

4        The state appellate court then relied upon state law to conclude that the jury instructions

5    given originally, and the supplemental jury instruction given in response to the jury's question,

6    were correctly conveyed to the jury.  (Resp. Ex. E at 11-12.)

7        We thus examine the instructions to determine if they correctly
     conveyed to the jury the law of voluntary manslaughter based on provocation
8    and heat of passion.  Heat of passion is a theory of "'partial exculpation' that
     reduce[s] murder to manslaughter by negating the element of malice."
9    "Voluntary manslaughter is the unlawful killing of another person without
     malice 'upon a sudden quarrel or heat of passion.' [Citations.]  Under that
10   theory, an unlawful killing is voluntary manslaughter "'if the killer's reason
     was actually obscured as the result of a strong passion aroused by a
11   'provocation' sufficient to cause an "'ordinary [person] of average disposition
     . . . to act rashly or without due deliberation and reflection, and from this
12   passion rather than judgment."  "The essence of the sudden quarrel/heat of
     passion voluntary manslaughter is that the killer is so provoked by acts of the
13   victim that he strikes out in the heat of passion, an emotion that obliterates
     reason that would prevail in the mind of a reasonable person.  That
14   circumstance negates malice aforethought, and reduces the crime from second
     degree murder, which otherwise would be its classification."
15
         "Thus, '[t]he heat of passion requirement for manslaughter has both an
16   objective and a subjective component. [Citation.]  The defendant must
     actually, subjectively, kill under the heat of passion. [Citation.]  But the
17   circumstances giving rise to the heat of passion are also viewed objectively."

18       While we think the trial court would have been better advised to limit
     the response to a re-reading of the standard voluntary manslaughter and
19   provocation instructions, we find nothing in the supplemental instruction that
     was an incorrect statement of law.  The jury sought guidance on
20   "provocation," specifically whether defendant's "earlier experiences" could
     be considered to determine if his actions were those of an "ordinary person."
21   The trial court properly declined to instruct the jury, as the defense proposed,
     that the prior molestation and its impact on defendant's psychological state
22   was evidence pertinent to the provocation component of voluntary
     manslaughter.  Even if we assume that defendant actually killed Croskey in a
23   heat of passion - the subjective component of the manslaughter test - his
     earlier experiences and individual sensitivity to a perceived homosexual
24   advance had no bearing on the provocation element which was the subject of
     the jury inquiry.  Heat of passion "must be aroused by sufficient provocation
25   judged objectively."  "[H]eat of passion must be such a passion as would
     naturally be aroused in the mind of an ordinarily reasonable person under the
26   given facts and circumstances," because "no defendant may set up his own
     standard of conduct and justify or excuse himself because in fact his passions
27   were aroused, unless further the jury believe that the facts and circumstances
     were sufficient to arouse the passions of the ordinarily reasonable man."
28   "Because the test of sufficient provocation is an objective one based on a

1   reasonable person standard, the fact the defendant is intoxicated or suffers
    from a mental abnormality or has particular susceptibilities to events is
2   irrelevant in determining whether the claimed provocation was sufficient."
    "'[E]vidence of defendant's extraordinary character and environmental
3   deficiencies was manifestly irrelevant to the inquiry.' [Citation.]"

4   (Resp. Ex. E at 11-13.) (Internal citations omitted.)  The state appellate court concluded that the

5   statements of law given by the trial court were correct, and there was no instructional error.  (*Id.*

6   at 13.)

7           To obtain federal collateral relief for errors in the jury charge, a petitioner must show that

8   the ailing instruction by itself so infected the entire trial that the resulting conviction violates due

9   process.  *See Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991).  However, a challenge to a jury

10  instruction solely as an error under state law does not state a claim cognizable in federal habeas

11  corpus proceedings.  *Id.*

12          Here, although Petitioner alleged in his federal petition that the instructional error

13  prejudiced his rights under the due process clauses of the state and federal Constitutions (Petition

14  at 27), that is the only reference to federal law that he makes concerning this entire claim.

15  Petitioner cites to no federal case law.  Nor does he present a federal question to the California

16  courts.  It is well understood that a petitioner may not "transform a state-law issue into a federal

17  one merely by asserting a violation of due process."  *Langford v. Day*, 110 F.3d 1380, 1389 (9th

18  Cir. 1996).  The Supreme Court has repeatedly held that federal habeas writ is unavailable for

19  violations of state law or for alleged error in the interpretation or application of state law.

20  *See Swarthout v. Cooke*, 131 S. Ct. 859, 861-62 (2011); *see, e.g., Walker v. Endell*, 850 F.2d

21  470, 475-76 (9th Cir. 1987) (failure to define recklessness was, at most, an error of state law

22  where recklessness was relevant to negate duress defense and government was not required to

23  bear burden of proof of duress).

24          As set forth by the California Court of Appeals, the jury instructions as given were

25  correct statements of the law.  This Court must defer to the California courts' interpretation of its

26  own laws.  *See Estelle*, 502 U.S. at 67-68.  Accordingly, Petitioner is not entitled to federal

27  habeas relief on this claim.

28

1

**CONCLUSION**

2      Petitioner's petition for writ of habeas corpus is DENIED.

3      The federal rules governing habeas cases brought by state prisoners require a district

4  court that denies a habeas petition to grant or deny a certificate of appealability ("COA") in its

5  ruling. *See* Rule 11(a), Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254.  Petitioner has

6  not shown "that jurists of reason would find it debatable whether the petition states a valid claim

7  of the denial of a constitutional right." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

8  Accordingly, a COA is DENIED.

9      The Clerk shall close the file.

10      IT IS SO ORDERED.

11  DATED: _7/16/12_                      *Lucy H. Koh*

12                                  LUCY H. KOH
                                  United States District Judge

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Order Denying Petition for Writ of Habeas Corpus; Denying Certificate of Appealability
G:\PRO-SE\SJ.LHK\HC.10\Shaw800hcden.wpd                11

UNITED STATES DISTRICT COURT

FOR THE

NORTHERN DISTRICT OF CALIFORNIA

BRUCE L SHAW,

          Plaintiff,

    v.

ANTHONY HEDGPETH et al,

          Defendant.

      Case Number: CV10-05800 LHK

      **CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on July 16, 2012, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Bruce L. Shaw V26556
Corcoran State Prison
P.O. Box 3461
Corcoran, CA 93212

Dated: July 16, 2012

                        Richard W. Wieking, Clerk
                        /s/ By: Elizabeth Garcia, Deputy Clerk